18   585
109  566

## FOOTE & WIFE *vs.* COBB.

1. Where the subscribing witness to a written instrument resides beyond the limits of the State, it is admissible in evidence upon proof of such witness' signature.
2. The acts of the donor subsequent to the execution of a deed of gift, other than a sale of the property to a *bona fide* purchaser for valuable consideration without notice, are not admissible evidence to prove it fraudulent.

Foote & Wife v. Cobb.

3. One to whom another is liable on a contract, express or implied, though contingently, is a creditor from the time the liability is entered into, within the meaning of the Statute of 13th Elizabeth.

4. Under the Statute of 13th Eliz., and the construction given to it by the English Courts, prior to the 14th May 1776, both of which have been adopted in the State of Georgia, a voluntary deed is fraudulent as against existing creditors of the grantor, although no actual fraud was intended.

ERROR to the Circuit Court of Benton. Tried before the Hon. Thos. A. Walker.

THIS was an action of detinue, instituted by the plaintiffs against the defendant in error, to recover certain slaves. The plaintiffs claimed the slaves in controversy under a deed of gift executed in the State of Georgia, on the 14th March 1825, by one John C. Hooper to Amanda Greenwood, now Amanda Foote, one of the plaintiffs. The defendant, on proof of the handwriting of the subscribing witness, and that he resided in the State of Georgia, offered in evidence a bill of sale executed to him on the 18th Nov. 1831, for the slaves in controversy, by one C. W. Bond. To the introduction of the bill of sale on this proof, the plaintiffs objected, but their objection was over-ruled and bill of sale allowed to be read. The defendant offered to prove that John C. Hooper in 1828 ranaway with his property to avoid the payment of his debts. The proof was offered in connection with evidence conducing to show that said Hooper was indebted at the date of the deed of gift and so continued up to the time he absconded from the State of Georgia. The plaintiffs objected to that portion of the proof offered that went to show that Hooper ranaway with his property in 1828, &c., but the court overruled the objection and the evidence was permitted to go to the jury. The defendant proved that prior to 1825, John C. Hooper, as the agent of one Joseph Lett, sold a negro woman and child for five hundred dollars, on a credit, and undertook to pay the same to the principal when collected, and introduced in evidence the transcript from the inferior court of Franklin county, in the State of Georgia, showing a suit commenced against him by said Lett on the 7th of June, 1827, to recover the proceeds of said sale, a judgment rendered in said suit, an execution issued thereon on the 28th January, 1828, and a sale of the slaves in controversy under and by virtue of a levy of said execution by the sheriff of Franklin county afore-

said. It was agreed between the parties that the statutes of 13th and 27th Elizabeth were in force in Georgia at the time of the execution of the deed of gift, and that they received in that State the construction placed upon them by the English courts prior to the 14th May, 1776. There was some evidence tending to show that John C. Hooper, in executing the deed of gift, acted in good faith and without any fraudulent intent.

The court charged the jury in substance, that if they believed from the evidence that John C. Hooper was, at the time of the execution of the deed to Amanda Greenwood, indebted to Lett, and that as the deed was voluntary merely, it was void as against Lett, and a sale under the judgment obtained by him confered a valid title on the purchaser, although the deed may have been executed in Georgia, and Hooper, in executing it, acted in good faith and without any intention to hinder, delay, or defraud his creditors. To the several rulings and to the charge of the court the plaintiffs excepted and now assign them as error.

RICE & MORGAN, for the plaintiffs.

WHITE and J. B. MARTIN, for the defendant.

CHILTON, J.—1. The first question which this case presents for our decision, is, whether a written instrument, the subscribing witness to which resides beyond the jurisdiction of the court, is sufficiently proved to be admitted to go as evidence to the jury, upon proof of the signature of such witness. We think it was, and such was the decision of our predecessors in Thomas v. Walker, 5 Ala. 268—see also, Mardis' Adm'rs v. Shackelford, 4 ib. 503, and the numerous cases refered to upon this point in 3 Phil. Ev., (C. & H. notes,) 1299.

2. The deed of gift, under which the plaintiffs claim, was executed on the 14th March, 1825, and the defendant, to defeat the gift, was allowed to prove that the donor "ranaway with his property in 1828, to avoid the payment of his debts." This proof was offered in connection with evidence that showed the donor was indebted at the time of the gift, and so continued up to the time he absconded from the State of Georgia. We cannot perceive upon what principle the court below allowed the proof that the party ranaway three years after the gift was made.

HARVARD LAW SCHOOL LIBRARY

Neither the acts, nor the declarations of the donor, which occur so long after the gift as to constitute no part of the *res gestæ,* can be properly received to defeat the gift. That the donor was indebted at the time of the execution of the deed, and that these debts have never been paid by him, were facts which the defendant was properly allowed to prove; but to hold that the donor may by his subsequent acts or declarations defeat a gift, which he has previously perfected, is to make all gifts ambulatory and subject to be defeated at the will of the donor. Of course we do not mean to include in this remark such acts as involve the rights of third persons, *bona fide* acquired from the donor and for a valuable consideration, without notice of the previous gift, for in favor of such the statute postpones a volunteer. But the act here allowed to be proved is not of this character. As well might the court have allowed the party defendant to prove, that three years after the gift was made, Hooper, the donor, declared the gift was made to defraud his creditors. We have uniformly held such proof inadmissible.—Strong's Ex'r v. Brewer, 17 Ala. 706-12; Julian et al. v. Reynolds, 8 ib. 680.

3—4. As this case must go back, it is necessary that we should express our opinion upon the main point argued before us, which is, whether by the law of Georgia this deed, which was voluntary, was void as against the then existing creditor of the donor. We state the proposition thus broadly; for we do not entertain a doubt upon the question, that the facts set forth in the bill of exceptions constitute Lett such a creditor as brings him within the protection of the 13th Eliz. c. 5; 12 Ves., (Sumner's edit.,) 155, n. 2; Fox v. Hills, 1 Conn. R. 295; Jackson v. Myers, 18th Johns. R. 425; 2 Kent's Com. 442, notes—see also, the cases cited in 1 Amer. Leading Cases, by Hare & Wallace, p. 57.

We are informed by the bill of exceptions that at the time of the execution of the deed under which the plaintiffs claim, the statutes of 13th and 27th Eliz. were substantially enacted in the State of Georgia, and that said statutes received in that State the construction placed upon them by the English courts prior to the 14th May, 1776,—and it is insisted that this gift must be governed by the law of that State existing at the time it was made.

It is contended that the construction which the English courts placed upon the statute, 13th Eliz., c. 5, prior to the 14th May, 1776, allowed a voluntary deed, if *bona fide* made, without any actual intent to defraud, &c., to prevail over the claims of subsisting creditors. And the counsel refer us to the case of Cadogan v. Kennett, 2 Cowper's R. 432, where Lord Mansfield, after stating, that by the rules of the common law as then understood, every end proposed by the statutes of 13th and 27th Eliz. could have been attained, and that these statutes could not receive too liberal a construction, or be too much extended in suppression of fraud, proceeded to say—"The statute, 13th Eliz., c. 5, which relates to frauds against creditors, directs that no act whatever, done to defraud a creditor or creditors, shall be of any effect against such creditor or creditors.— But then such a construction is not to be made in support of creditors, as will make third persons sufferers. Therefore the statute does not militate against any transaction *bona fide,* and where there is no imagination of fraud; and so is the common law." He further adds, "that a fair voluntary conveyance may be good against creditors, notwithstanding its being voluntary. The circumstance of a man being indebted at the time of his making a voluntary conveyance, is an argument of fraud. The question, therefore, in every case, is, whether the act done is a *bona fide* transaction, or whether it is a trick or contrivance to defeat creditors." The views of that eminent jurist, which we have above quoted, were not really involved in the decision of the cause before him, and at most are to be regarded as *obiter dicta.* That was a settlement made before marriage, and in consideration thereof, upon the settler for life, remainder to the wife for life, remainder to the children of the marriage, and in strict settlement, the wife being a ward of the court of chancery and bringing to the husband a portion of ten thousand pounds; the settlement being refered to and approved by a master in chancery. His lordship laid stress upon the fact that the very object of the settlement was that the lady's fortune might be applied to the husband's (the settler's) debts, and that such settlement was approved by a master in chancery, and the cases to which general reference is made are of a similar character. Now, so far as I am advised, it then was and ever since has been the settled doctrine in England, that such settlements *were*

*not voluntary.* Upon the marriage of a ward of the court of chancery, the husband was required to obtain the consent of the court, and if he failed to do so, he was in contempt of its authority. For such contempt, the court was wont to imprison him and to keep him in confinement until he should make a proper settlement of his wife's fortune, to be approved by the court.— See Stephens v. Savage, 1 Ves. 154; Chassaing v. Parsonage, 5 ib. 15; 2 Atk. 173; 16 Ves. 259; 8 ib. 74; 4 ib. 386; Atherly on Marriage Set. (marg.) 371. The author last quoted, on p. 375, says, "It may hardly be necessary to observe that such settlements, being made under the authority of the court of chancery, are not *voluntary,* notwithstanding they are made after marriage; and consequently, that they are *good* both as against purchasers and creditors." The English reports abound with cases to this effect.— See Like v. Beresford, 3 Ves. (Sumner's edit.) 506, and cases cited in the notes; also, Ball v. Montgomery, 2 ib. 191, note *b,* and Chassaing v. Parsonage, *supra;* 2 Story's Eq. Juris. § 1411, and cases cited. In such cases the court of chancery usually requires the *whole* of the wife's property to be settled upon her, where the husband makes no settlement out of his own estate; if, however, the court accepts a settlement made by him of his own estate, and in consideration thereof invests him with the property of the wife, which but for such provision would have been settled upon her, it follows that such settlement is based upon a valuable consideration, and cannot in any sense of the word be said to be voluntary.—Atherly on Mar. Set. 374. I therefore conclude that the case of Cadogan v. Kennett, though a correct decision, was based upon incorrect reasoning, and that such cases furnish no authority for the position that a voluntary conveyance, not conceived in actual fraud, shall prevail over existing *bona fide* creditors.

The decision in Doe v. Routledge, 2 Cowp. 705, which arose under the 27th Eliz., c. 4, and was made a year subsequent to the case of Cadogan v. Kennett, asserts the doctrine, that to make a voluntary settlement void against a subsequent purchaser, within the statute, it must be *covinous* and *fraudulent;* not *voluntary only.* It is worthy of remark, however, that the circumstances of this case did not take it wholly without the influence of the principles which should properly have governed in

the case of Cadogan v. Kennett; for in this case, as in that, a subsequent marriage was superinduced in virtue of such a settlement. The facts as stated show, that Routledge, in whose favor the voluntary surrender of the copy-hold estate was made, some four years thereafter, paid his addresses to Miss Bell, and exhibited a copy of such surrender to her and her father, who thereupon gave their consent to the marriage, which was soon after consummated. Besides this, the person who invoked the aid of the statute, as a subsequent purchaser, was held to have purchased in fraud and was adjudged himself not to be a *bona fide* purchaser, so that this was decisive of the case. But it is also worthy of especial notice, that this same learned judge (Lord Mansfield) in 1775, two years previous to the decision in Doe v. Routledge, held that a voluntary settlement, made *after* marriage, came within the statute of 27th Eliz., c. 4, and was void as against a subsequent mortgagee, who took the mortgage with a knowledge of such previous settlement.—Chapman *ex dem.* Stanton v. Emory, 1 Cow. 278. The facts upon which the judgment of the court was predicated show no actual fraud in making the settlement, nor was there any evidence that the settler owed any debts at the time, to be affected by it. The decision rests upon the ground, that in favor of a subsequent mortgagee, who was considered in the light of a *bona fide* purchaser for a valuable consideration, the statute avoided the prior voluntary conveyance, because it was voluntary. Lord Mansfield seemed to base his opinion, in the cases of Cadogan v. Kennett, and *Doe ex dem.* Watson v. Routledge, upon a decision of Lord Hardwicke, (Newstead v. Searle, 1 Atk. 264,) and similar cases, but when critically examined, it will be found that such cases proceed upon a principle, altogether different from that he would educe from them. The case of Newstead v. Searle perhaps goes farther than any of the others to favor his views. In that case it was held that a voluntary limitation, *concurrent* with a limitation in tail, supported by valuable consideration, was *good* as against purchasers. Now we agree with Mr. Atherly, that all such conveyances as these have their basis in a valuable consideration, and are not voluntary *in toto;* for if they are purely voluntary, they fall within the statute.—Ath. Mar. Set. 247. They are most usually found to be supported by the consideration of marriage and a marriage portion. Such were

the cases of Jenkins v. Kemish, Hardress' R. 395, in which
Lord Hale is reported to have said, " That the consideration of
the marriage, and the marriage portion, will run through all the
estates raised by the settlements, though the marriage be not
concerned in them, so as to make them good as against purcha-
sers :—Also, Osgood v. Strode, decided by Lord Macclesfield,
in 1724, (1 P. Wms. 245,) in which, however, his lordship·
held that the marriage and marriage portion supported only the
limitation to the husband and wife, and their issue ; but, speak-
ing in reference to the case in Hardress, he observed, that it
(the settlement) could not well have been intended to cheat
creditors, unless the person making the same were then in debt.
We then repeat, that these cases furnish no authority for hold-
ing that a purely voluntary conveyance, whether in the form of
a settlement or otherwise, should prevail over the claims of
creditors existing *at the time* such conveyance is made.

We have noticed some, perhaps the most important cases in
the old books, which seem to favor the doctrine as contended
for by the counsel for the plaintiffs in error.    We propose next
to consider some which distinctly declare the true construction
to be otherwise, and this has been so ably done by Lord Ellen-
borough, in the case of Otley v. Manning, 9 East. R. 59, as to
render a labored investigation of them unnecessary.    He has
collated the principal cases, from the time of the passage of the
statutes of 13th and 27th Eliz., to the period of making his
decision, embracing a period of more than two hundred years,
and very clearly shows that the great preponderance of authority
is in favor of the view which he takes, that a voluntary convey-
ance was by the law to be adjudged fraudulent, upon the con-
struction of 27th Eliz., c. 4, as against a subsequent *bona fide*
purchaser for a valuable consideration, although there was no
fraud in fact; and this view is sustained by Colville v. Parker,
Cro. Jas. 158; Prodgus v. Langham, 1 Sid. 133 ; White v.
Hussey, Precedents in Ch. 14 ; Pr. Lord King, in Gardner v.
Painter, Cas. Temp. King, 65, (1726); Tonkins v. Eunis, 1
Eq. Cas. Abr. 334, (1727); By Lord Hardwicke, in White v.
Sansom, 3 Atk. 412, who said he hardly knew an instance
where a voluntary conveyance had not been held fraudulent
against a subsequent purchaser; also, in Lord Townsend v.
Windham, 2 Ves., sr., 10; By Lord C. J. Wilmot, in Roe v.

Milton, 2 Wils. 356; By Lord C. J. De Grey, in Goodright v. Moses, 2 Sir W. Black. R. 1019. These were cases arising under the 27th Eliz., but the principle of construction equally applies to both statutes. In reviewing the cases cited, in opposition to the view taken by Lord Ellenborough in *Doe ex dem.* Odey v. Manning, *supra*, his lordship observed, that if it were necessary to go into the examination of them, it would be found in most, if not in all of them, there were reciprocal considerations; some benefit.acquired by the persons making the settlement, which might fall under the denomination of a valuable consideration, though perhaps.other persons derived a benefit from them, who were not the principal objects to be benefitted.

In 1695, we find the English Court of Chancery holding a voluntary settlement, made after marriage, void as against a subsequent purchaser for value, and the distinction is taken between creditors subsisting at the time of such settlement, and those who become such afterwards—"For the statute of 13th Eliz. makes not every voluntary conveyance, but only fraudulent conveyances, void as against creditors; so that as to creditors it is not sufficient to say the conveyance is voluntary, *but must show they were creditors at the time the conveyance was made*, or by some other circumstance show the conveyance was made to deceive or defraud a creditor."—Shaw v. Lady Standish et al., 2 Vern. 326. Lord Hardwicke said, in Russel v. Hammond, 1 Atk. 15, he has hardly known a case where the person conveying (by voluntary conveyance) that the settlement was not deemed fraudulent—and Lord Talbot considered it doubtful whether a voluntary settlement was good even as against a subsequent creditor.—Jones v. Marsh, Cas. Temp. L'd Talbot, 63.

Chancellor Kent, in the celebrated case of Reade v. Livingston, 3 Johns. C. Rep. 481, after reviewing the English cases, says, "All the cases assume the position to be undeniable that the husband must not be indebted at the time of the settlement. They leave no possible doubt on the point." The rule in Lord Hardwicke's time, that a voluntary conveyance was void as against existing creditors, was so fully settled, that, in Fitzer v. Fitzer, 3 Atk. 511, that distinguished Lord Chancellor demanded of the Attorney General, "if there was an instance to be found in that court, where a conveyance from hus-

band to wife, without any pecuniary consideration moving from the wife, had been held to be good against creditors. In Lord Townshend v. Windham, 2 Ves. Sr., 1, he expressed himself in equally as decided terms. He took it that a man, "actually indebted and conveying voluntarily, always meant to defraud creditors," and Chancellor Kent, commenting on this case, says he understands him to mean here, "that this was the conclusion of law, which was not to be gainsaid." But it is needless for us to dwell upon the numerous decisions which were made by the English Courts upon this subject. They are reviewed in a masterly style by the learned Chancellor, in Read v. Livingston, *supra*, and he arrives at the following conclusion as the result of them, "that if the party be indebted at the time of the voluntary settlement, it is presumed to be fraudulent in respect to such debts, and no circumstance will permit those debts to be affected by the settlement, or repel the legal presumption of fraud; that the presumption of law in such case does not depend upon the amount of debts, or the extent of the property in settlement, or the circumstances of the party; there is no such line of distinction set up or traced in any of the cases; the attempt would be embarrassing, if not dangerous to the rights of the creditor, and prove an inlet to fraud. The law has, therefore, wisely disabled the debtor from making any voluntary settlement of his estate *to stand in the way of his existing debts*." This he declares to be the clear and uniform doctrine of the cases.

That this was the construction placed by the English Courts of Chancery upon the 13th Eliz. *c.* 5, in May 1776, and both before and since that time, until within comparatively a modern date, we do not entertain a doubt, and as this statute with the English construction above ascertained, was of force in Georgia when the deed of gift was made by Hooper to Mrs. Foote, her rights must yield to the paramount claims of those, who were creditors of the donor at the time of the gift.

We are aware that this doctrine, once so well established, which forbids that a man should give away his property in defiance of the rights of honest creditors, whose debts remain unpaid,—so simple as to be fully understood by all, and so certain in its administration as effectually to close the door to every attempt at a fraudulent disposition of property to avoid the pay-

ment of debts—has been deemed too stern for modern times by the English, as well as by most of the American Courts. It will, therefore, not be amiss to refer to some of the English and American decisions of more modern date, as furnishing the reason for the rule of construction adopted by the English Courts at the time of which we have been speaking, as illustrations of the dangerous uncertainty which must result from a contrary rule. In Lush v. Wilkinson, 5 Ves. 84, Lord Alvanly thought *insolvency* was necessary to render a voluntary conveyance fraudulent as against existing creditors. In Richardson v. Smallwood, Jac. 51, Sir Thomas Plumer said, that it was not necessary to prove insolvency on the part of the setler, but it was sufficient if he was *largely* indebted. In Townshend v. Westacott, 2 Beav. 340, Lord Langdale holds that it is not necessary to prove insolvency, but the mere proof of an existing indebtedness is not sufficient, and such seems now to be the position of the question in England.—See Skarff v. Loulby, 13 Juris. 1109, S. C., U. States Mod. Law Magazine, May 1850, p. 469.

In this country the boundary is less distinctly marked by those courts which have decided upon the qualification, which it seems pretty generally agreed, should obtain. But it is very manifest that the caution with which they proceed evinces a distrust of the soundness of the doctrine for which they contend.

In South Carolina the debts of the donor must be *inconsiderable—current expenses for example ;* and he must have *ample funds* over and above the property given.—Hundal v. Wilder, 4 McCord, 302.

In Connecticut it was decided, that if the grantor was in *prosperous circumstances*, he might make a valid gift of one *eighth* part of his real estate, though his existing creditors go forever unpaid, (Salmon v. Bennett, 1 Conn. 525,) albeit, he must be unembarrassed, and not *considerably indebted*, the gift, moreover, must be a *reasonable* provision for a child according to his state and condition in life, must comprehend but a *small portion* of his estate, and leave *ample funds*, unencumbered, for the payment of his debts.

In Massachusetts, if the grantor be *deeply* indebted, his existing creditors may avoid his gift.—Parkman v. Welch, 19 Pick. 231. See the American cases collected in 1 American Leading Cases, and in Van Wyck v. Seward et al., 18 Wend. 375, per

Bronson, J., whose opinion is an unanswerable argument in favor of the doctrine as asserted in Read v. Livingston.

Now an exception, hedged about with so many qualifications of a vague, general and indefinite character, and which must of necessity be as uncertain in its application as its limits are undefined and indefinable, can never, in our judgment, rise to the dignity of a law. Moreover, it trenches upon that stern principle of justice and sound legal morality, which requires that we should discharge our obligations to others before we gratuitously enrich even the most cherished objects of our bounty.

" The relaxation," says Chancellor Kent, "goes to destroy conservative principles and to commit sound, wholesome, and stern rules of law to the popular disposal and unstable judgment of jurors," and he designates it an "*enervating infirmity.*"—2 Kent's Com., note to pages 242-3, 6th ed.

In Miller v. Thompson, 3 Port. 206, Saffold, C. J., said: "Under a practice of this kind" (alluding to the uncertainty in giving effect to such exception,) "I think we might expect a different rule of right from each several trial, and that it would be impossible to establish anything like certainty or uniformity of title, under voluntary conveyances." In the case last cited, this court, overruling the previous decision of Toulmin v. Buchanan's Ex'rs., 1 Stew. 67, affirm the doctrine of Read v. Livingston, and hold that a voluntary conveyance of property by a father to his children is utterly void as against the existing creditors of the father, and such is now the well settled doctrine of this court.—Cato v. Easly, 2 Stew. 214; Moore v. Spence, 6 Ala. 506; Costillo & Keho v. Thompson, 9 ib. 937; High v. Nelms, 14 ib. 350. We have thus dwelt upon this point, not that we had any difficulty in regard to it, but because it is suggested we are following an exploded doctrine. We regret to express our fears that with the exception of the courts of two or three States in the Union, we struggle alone for the advocacy of this simple rule, shorn of all enervating qualifications, but believing it to be the law, and that it was so construed by the courts of England at the time designated in this bill of exceptions, we shall, nevertheless, maintain it with becoming firmness.—See O'Daniel v. Crawford, 4 Dev. 97; Kissam v. Edmundson et al., 1 Iredell's Equity Rep. 180; Bogard v. Gardley, 4 Smedes & Mar. 302.

The charge of the court below, on the main point in the cause, and that upon which we apprehend the case will turn, was in accordance with the views we have here expressed, and was, in our opinion, correct. We deem it unnecessary to notice the other questions argued before us, as they will not likely arise upon a subsequent hearing.

For the error first noticed, the judgment must, however, be reversed, and the cause remanded: