## ANONYMOUS.

[BILL IN EQUITY, BY CHILDREN CLAIMING UNDER MARRIAGE-SETTLEMENT, FOR PAR-
TITION OF PROPERTY AND GENERAL RELIEF.]

1. *Admissibility of declarations as affecting validity of deed.*—Where the validity of
a marriage-settlement is in controversy, in a suit between the surviving
husband and his wife's children by a former marriage, the declarations of
the husband and wife, made after the execution of the settlement, are not
competent evidence against the children.

2. *Validity of deed as affected by duress.*—A marriage-settlement, executed by a widow two days before her intended second marriage, conveying her property in trust for her separate use during life, with remainder to her children, cannot be held to have been obtained by duress on the part of the children, on proof of the grantor's distressed state of mind at the time of its execution, and of threats made by her son against her intended husband, which were not communicated to her; it appearing that her distress, as well as the threats of her son, were caused by the fact that she was then pregnant by her intended husband.

3. *Validity of secret marriage-settlement.*—A marriage-settlement, secretly executed by a widow two days before her intended second marriage, without the knowledge of her intended husband, conveying her property to her separate use during her life, with remainder to her children, cannot be held fraudulent as against the husband's marital rights, in a controversy between him and the children, when it appears that, at the time the settlement was executed, the widow was pregnant by her intended husband.

APPEAL from the Chancery Court of Calhoun.

Heard before the Hon. JOHN FOSTER.

The complainants in this case, who were the children and grand-children of Mrs. Nancy E. C. by her first husband, filed their bill against her surviving second husband, Samuel B. W., and the children of said second marriage; asking a partition of certain slaves, and general relief. The complainants claimed these slaves under a deed which was executed by Mrs. C. in South Carolina, in 1827, two days before her intended second marriage; and by which these slaves, with some other property then belonging to her, were conveyed, in consideration of natural love and affection, to her children born and to be born, after reserving a life estate to herself. Answers were filed by the defendants, insisting that said deed was void on account of duress, and also because it was executed in anticipation of the grantor's second marriage, without the knowledge or consent of her intended husband, and was, therefore, a fraud on his marital rights. On final hearing, on pleadings and proof, the chancellor held the deed void, and therefore dismissed the complainants' bill; and his decree is now assigned as error. A statement of the facts in detail is not deemed necessary to a correct understanding of the legal principles decided.

Wm. P. Chilton, and M. J. Turnley, for appellants.

Jas. B. Martin, and G. C. Whatley, *contra.*

STONE, J.—It is contended for appellees, that the deed of Mrs. Nancy E. C., dated June 12th, 1827, was obtained by threats and duress on the part of her children. The testimony relied on in support of this proposition is that of Mr. D., and Mr. and Mrs. B. The testimony of Mr. D., who is brother to Mrs. C., is by far the most important.

In pronouncing on this question, we feel it our duty to disregard, as illegal evidence for appellees, all that either Mr. or Mrs. W. said after the deed was executed.—See Price v. Branch Bank at Decatur, 17 Ala. 374 ; Strong v. Brewer, *ib.* 706 ; Foote v. Cobb, 18 Ala. 585. This limits the testimony of Mr. D. on this point to what he says took place in the office of Mr. C., [an attorney] the day the deed was executed. On that day, Mr. C., Mr. W. and Mr. D. were present. Mr. F., the other subscribing witness, was also present a part of the time. Mr. D. does not pretend that anything was communicated to him privately ; but the language of his testimony tends strongly to the conclusion, that what Mrs. C. stated was uttered aloud, in reply to what Mr. C. had said to her, and in the hearing of all present. If this be so, he stands contradicted positively by Mr. C. and Mr. W., and by strong implication in the testimony of Mr. F. In giving his testimony, Mr. D. betrays a want of accuracy as to the property conveyed, and the length of time which elapsed between the making of the deed and the solemnization of the marriage, which renders it extremely unsafe to trust his recollection. He is also contradicted by W., as to the object for which these two witnesses were procured to be present at the time.

It is not our purpose to reflect on the integrity of Mr. D. His testimony relates to a transaction which, when he deposed, was thirty years old ; and all men are liable to errors after so great a lapse of time. What we intend to affirm is, that the witnesses C. and W. betray a more

intelligent appreciation and recollection of the transaction, and we accord to their testimony the greater weight.

The chancellor founds his decree on this point mainly on the distressed state of feelings exhibited by Mrs. C. while the deed was being prepared and executed. Her distress of mind is shown by the testimony of Mr. W., as well as that of Mr. D. We do not regard this circumstance as sufficient to establish the charge of coercion in procuring the deed. She was doubtless conscious that she was soon to be somewhat degraded from her former social position. It is probable that her family and friends, if not others, were already acquainted with her digression from the path of propriety. The testimony of many of the witnesses, including Mr. D., tends to show that the wrath of her son was caused by the disgrace which Mr. W. had brought upon their mother. We think her distress of mind may, with as much probability, be charged to a consciousness of impending disgrace, as to any fears she may have entertained that her son would lay violent hands on Mr. W.

The testimony of the witnesses, Mr. and Mrs. B., bearing in mind the great lapse of time between the occurrences about which they testify, and the giving of their evidence, should, we think, weigh but little. They speak of threats made by the eldest son and by a daughter of Mrs. C. The son was then probably under age, and the daughter much younger. There is no evidence that these threats were ever communicated to Mrs. C., and we do not think them sufficient to invalidate the deed on the ground of duress.

Two facts, in the absence of satisfactory evidence of threatened violence to the person of Mr. W., are decisive to turn the scale against this ground of relief. First, the reasonableness of the presumption that Mrs. C., knowing the habits and poverty of Mr. W., would desire to secure her property beyond his power to charge it. This presumption is strengthened by the testimony of W. Second, that Mr. W., after the marriage, and as long as he remained in South Carolina, some eight or nine years, did not claim the property as his own, but spoke of it as

belonging to his wife. Nor do we hear of any effort on his part to undo the deed of June 12th, 1827, until the year 1848—a period of more than twenty years. These circumstances, with the evidence stated above, are to our minds conclusive against the charge of actual fraud, violence and duress, relied on in the answer of Mr. W.

This case, then, is narrowed down to the following inquiry: Is the deed of June 12th, 1827, constructively fraudulent as against the marital rights of Mr. W. ? The facts are these: Mr. W. and Mrs. C. had an engagement to marry; they cohabited together, and Mrs. C. became pregnant. In this situation, two days before the marriage, Mrs. C. by deed settled her property to her sole and separate use and enjoyment during her life, and at her death to her children by a former marriage, and such children as she might afterwards have. The testimony does not inform us that Mr. W. assented to the making of this deed, or had knowledge of it, until after the marriage. It is contended for appellants, that Mr. W., by force of the situation in which his conduct had placed Mrs. C., put it out of her power to retire from the marriage; that she was thus under moral duress, and could not, in the matter of requiring a settlement, deal with him on equal terms; and that this excuses her for resorting to the only expedient left her, of making a secret settlement.

One argument urged by appellees against this view, is as follows: Conceding that the chancellor, if Mr. W. were the actor in this suit—had himself invoked relief against this deed—would not, for the reason above stated, become active in his favor; still, a different rule applies, when the powers of the chancery court are invoked in aid of a deed thus obtained: that while chancery will withhold all assistance from a husband thus in fault, it will nevertheless refuse all active sanction of a transaction which the law characterizes as a fraud upon the rights of the husband.

We concede that there are many transactions, where chancery will not lend its aid to either party, but will leave them to such redress as the law can afford them. See 2 Story's Eq. §§ 736, 737, 742, 749, 750, 751, 767, 771

to 779; *Ib.* 769; Blackwilder v. Loveless, 21 Ala. 371; James v. State Bank, 17 Ala. 69; Pulliam v. Owen, 25 Ala. 492.

In the case of Hunt & Frowner v. Acre & Johnson, 28 Ala. 589, 598, which presented the question of a usurious defense, we held, that "the rule, that a plaintiff, who comes into a court of equity for relief against a judgment at law, or other legal security, on the ground of usury, can not be relieved except upon the terms of paying to the defendant the principal and legal interest, applies to cases where the debtor has, by *his own voluntary act, deprived himself* of the opportunity to appear in the character of the defendant and plead the usury." If we were to apply that rule to this case, it is manifest that the complainants, *by no voluntary act* of theirs, have made it necessary that they shall assert their claim as actors in a court of chancery. The accident, which prevents them from joining as plaintiffs the other remainder-men, and thus asserting their claim at law, rendered a resort to chancery necessary. We do not, however, propose to base our opinion on this principle. If there be any merit in the excuse urged for making the *ex-parte* settlement of her property by Mrs. C., it rests on the independent equity with which Mr. W. had, by his conduct, armed her, viz., that she was placed in moral duress by his act; that, in her then condition, she had no power to prescribe terms on which the marriage should take place; that to require his assent to the settlement, would be simply an abandonment of her right to make it; that thus having an undue advantage of her, he will not be heard in equity to complain that the settlement of her property on herself during life, and afterwards for the equal benefit of all the children she might have, was a fraud upon his marital rights.

The precise question we are considering was before the English court of chancery, in the case of Taylor v. Pugh, 1 Hare, (23 Eng. Ch.) 608. The vice-chancellor refused to set aside the settlement, which was made by the intended wife on the eve of her marriage, and without the knowledge of her future husband; which settlement, like that made by Mrs. C., secured the property to herself dur-

ing life, and afterwards to her children. The language of the court was: "By his (the husband's) conduct towards her, retirement from the marriage was on her part impossible. She must have submitted to a marriage with her seducer, even although he should have insisted on receiving and spending the whole of her fortune. The only way in which a woman can insist upon a settlement, is by making it a part of the marriage treaty that her property shall be settled. The husband, by bringing the intended wife to his house, and inducing her to cohabit with him before the marriage, deprived her of the power to protect herself, and thereby precluded himself from telling this court, with any effect, that his wife has committed a fraud upon him, because she has taken the precaution to have her property secured for herself and her children. I am very far within the limits of authority in saying, that a woman, in the view of this court, commits no fraud on her husband, if, in circumstances like the present, she takes the only means he has left her of protecting herself—that of making a settlement without his knowledge."

It will be observed that the vice-chancellor characterizes the husband as a *seducer;* speaks of his *bringing his intended wife to his house,* and *inducing her to cohabit with him.* The report of the case contains no statement tending to show that the husband, by any act of his, induced the said Elizabeth to take up her abode at his house; nor does it show that he seduced her, or induced her to cohabit with him, further than those conclusions are inferable from her pregnancy at and before her marriage. No fact is shown which can in the least enable us to determine whether the husband or the wife was most in fault. Nor do we think this inquiry was deemed material by the vice-chancellor. He based his decree, not on the fact that the husband was most in fault, but on the fact that he had placed it out of the power of the wife to protect herself, by requiring a settlement. On this ground, the court said, not only that the husband had *precluded* himself from telling the court, *with any effect, that*

*the wife had committed a fraud upon him*, but added in another place, that she had in fact committed *no fraud upon him*.

The language of the court, copied above, implies much more than that, owing to the conduct of the husband, the court would not interfere actively in his behalf. It in effect declares, that the secret settlement made by the wife, on the eve of her marriage, was, under the circumstances, purged of all imputation of fraud upon the marital rights of her intended husband.—See 1 Story's Eq. § 273, and note.

We fully approve the principles settled in Taylor v. Pugh, *supra*, and make them the basis of our decree.

From what we have said it necessarily results, that the chancellor erred in dismissing complainants' bill. He should have granted them relief.

Reversed and remanded.

A. J. WALKER, C. J., not sitting.